# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 13cr130 WQH |
| Plaintiff, | ORDER |
| vs. | |
| JUAN JOSE GRANDE, | |
| Defendant. | |

HAYES, Judge:

The matters before the Court are 1) the motion to dismiss the information (ECF No. 17) and 2) the motion to suppress evidence and to dismiss the information (ECF No. 22) filed by the Defendant Juan Jose Grande.

## FACTS

On December 31, 2012, at approximately 11:00 p.m., Bureau of Land Management (BLM) Officer Jason Peters was on patrol driving a marked law enforcement vehicle on a section of Wheeler Road located on BLM land. Officer Peters is a federal officer with peace officer authority through the BLM and the State of California. This location is approximately fifteen miles north of the United States/Mexico border. Wheeler Road is a dirt, unlit road approximately twenty miles from El Centro, California.

Officer Peters noticed two men walking on the side of the road. One of the men was the Defendant. Officer Peters testified that the two men looked out of place,

1 specifically that they were not prepared for the weather or the environment; that they
2 had no backpacks, water, or food; and that their attire was different from the usual off-
3 road vehicle attire. Officer Peters testified that he pulled up along side of the two men
4 and identified himself as Officer Peters and asked them "What is going on? What are
5 you guys up to?" (ECF No. 34 at 8-9). Officer Peters testified that one of the men later
6 identified as the Defendant told him "that there had been some sort of disagreement or
7 altercation that had occurred with his girlfriend in camp, and he and his uncle were
8 making plans to leave." *Id.* at 9. Officer Peters testified that "they said they ... had
9 been drinking, and that led to the fight, and that is why they were leaving." *Id.*
10 Defendant told Officer Peters that they were camping here for the weekend and that
11 they were going to walk to the nearest town.

12 Officer Peters activated his dash camera. Officer Peters exited his vehicle and
13 asked the men to approach him. Officer Peters testified "at that point I am... suspicious,
14 but I don't know whether criminal activity is afoot or if these are just two guys that are
15 in distress and they need help. Part of my job is to help people." *Id.* at 10-11.

16 Officer Peters asked the two men for identification and inquired where they were
17 going. Officer Peters testified that his "intention was to obtain their ID in case the
18 dispatcher called me later, which does happen, and say, 'Did you come into contact with
19 somebody so and so?'" *Id.* at 12.

20 Officer Peters asked the individuals if they could provide him with California
21 identifications. Defendant told Officer Peters that his girlfriend had taken his
22 identification cards. Defendant told Officer Peters that he had a California ID, that his
23 last name was "Garcia," that he lived in Riverside, and that his date of birth was
24 February 16, 1970. Defendant stated that he had a Nevada driver's license but that he
25 did not know the number. The other individual produced a Mexican voter registration
26 card. Officer Peters asked if they had a cell phone and the other individual stated that
27 he did, but that he did not know the number.

28 Officer Peters noticed that one of the men later identified as the Defendant was

1  wearing white plastic bags on his shoes which seemed odd to him.  Officer Peters told
2  the individuals that he was concerned because the nearest town was twenty miles away
3  and he did not think that they could walk there.  Officer Peters asked the individuals if
4  they wanted to go back their camp and both individuals responded that they did not.
5  Officer Peters asked the individuals to take a minute to think about it while he returned
6  to his vehicle.   A canine officer arrived at the scene.  Officer Peters returned to his
7  vehicle and reported his encounter with two individuals who may have been separated
8  from their camping party, requested assistance from Border Patrol, and asked the
9  dispatch officer to run the names and dates of birth of the individuals.  Officer Peters
10 testified:

> I took their information, and I asked them to standby, and I went into my patrol vehicle.  And at that point my suspicions were changing about the nature of what the two subjects were doing walking along Wheeler Road, so I requested US Border Patrol to respond to do an evaluation for potentially undocumented aliens.  And then I called into my dispatch to run the subjects for a standard wants and warrants check, and about that time my partner arrived on scene.

*Id.* at 14.

Officer Peters returned and handcuffed the two individuals and told them that they were being detained.  Officer Peters testified:

> ...I formed the opinion that something – that I needed to detain Mr. Grande and his friend pending investigation either into public intoxication or potentially undocumented aliens, so I placed them in handcuffs and told them they were being detained at that point for public intoxication pending my investigation.

*Id.*  Officer Peters testified that he did not suspect the two men of committing an immigration law violation when he initially stopped them.  Officer Peters testified that he eventually formed the suspicion that the Defendant had violated an immigration law. Officer Peters testified that violating immigration law was not his "main suspicion" and that "it was an investigative detention for public intoxication."  *Id*. at 22.

Border Patrol Agent Wilhelm received a radio call at approximately 11:15 p.m. on December 31, 2011 "stating that there was a BLM ranger requesting assistance with two possible illegal aliens near Wheeler Road and Superstition Mountains."  (ECF No.

1  34 at 34). Agent Wilhelm testified that at the time he received the call he was at a
2  location five or six miles away and proceeded to Officer Peter's location.

3  Approximately ten minutes after Officer Peters detained the two men, Agent
4  Wilhelm arrived at the scene. Agent Wilhelm interviewed the Defendant who stated
5  that he was a Mexican national with no legal right to enter or to remain in the United
6  States. Agent Wilhelm advised the Defendant of his administrative rights in the
7  Spanish language. Defendant was placed under arrest and transported to the El Centro
8  Border Patrol Station for further processing, including photographs and fingerprinting.
9  Records checks showed that the Defendant had a criminal history, that Defendant had
10 a pending warrant, and that Defendant had been previously deported on June 8, 2011.

11 On January 28, 2013, an Information was filed charging the Defendant with
12 being a removed alien found in the United States in violation of 8 U.S.C. § 1326 (a) and
13 (b). (ECF No. 8).

14 **RULING OF THE COURT**

15 **Defendant's motion to suppress evidence and to dismiss the information** (ECF No.
16 22)

17 Defendant contends that his detention and arrest on December 31, 2012 violated
18 the Fourth Amendment and that all evidence the Government obtained as a result must
19 be suppressed. Defendant asserts that "because the arresting officer did not first secure
20 a warrant and had neither reasonable suspicion nor probable cause to believe that
21 [Defendant] had committed a crime, his detention and arrest of [Defendant] violated the
22 Fourth Amendment, and all evidence obtained as a result of [Defendant's] unlawful
23 seizure must be suppressed." (ECF No. 22-1 at 5). Defendant asserts that his
24 statements and any evidence from his A-file are inadmissible under the "fruit of the
25 poisonous tree" doctrine. Defendant contends that the Information must be dismissed
26 because the Government cannot prove the necessary elements of illegal re-entry.

27 The Government contends that Officer Peters had reasonable suspicion to stop
28 the Defendant, that the interaction with the Defendant and the other individual justified

the continued investigation, and that the limited detention was reasonable under the totality of the circumstances. The Government further asserts that dismissal of the Information is not the remedy, even if the Court concludes that a Fourth Amendment violation occurred.

The prohibition of unreasonable searches and seizures extends to the seizures of the person, including the brief investigatory stop of a person or vehicle. *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992). An officer may not detain a person without a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id*. A *Terry* stop[1] is a brief investigatory stop which is an exception to the probable cause requirement of the Fourth Amendment. "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *INS v. Delgado,* 466 U.S. 210, 215 (1984). "Beginning with *Terry v. Ohio,*[], the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. (citation omitted.) To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's actions must be justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place." *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004).

In this case, Officer Peters, a law enforcement officer authorized under both federal and state law, was patrolling federal land late at night in a remote area on an unpaved road approximately fifteen miles from the United States/Mexico border. Officer Peters encountered the Defendant and another individual walking on the side of the road. The two individuals were not adequately dressed for the weather or prepared for the environment. Officer Peters explained that there are no services of any

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

kind and no water or food available in the area. Officer Peters explained that it is very unusual to find people walking in the recreational area and that those individuals that do walk the road are often intoxicated or involved in an altercation at their camp site. The Court concludes that the officer's initial stop of the Defendant was reasonable based upon the time and place of the encounter and the officer's experience with the remote area and the individuals walking in the area. Officer Peters did not violate the Defendant's Fourth Amendment rights by stopping him and asking him for identification.

After the initial stop, the Defendant stated that he was walking to town to get a hotel. The nearest town was twenty miles away. Defendant was not able to produce any identification and Officer Peters testified that he eventually formed the suspicion that the Defendant had violated an immigration law. Officer Peters returned to his vehicle and asked his dispatch to call Border Patrol. Officer Peters testified that he went back, handcuffed and detained the two individuals to further investigate the crime of public intoxication. Officer Peters testified in part:

> Q. So the detention was not based on suspicion of any particular crime. You just were suspicious and wanted to get more information?
> A. As I stated, it was an investigative detention for public – public intoxication.
> Q. I'll rephrase, and the question is just yes or no. You had no suspicion of any particular crime at the time –
> A. Yes. Yes, I did.
> Q. The suspicion that you had formed at the time that you detained them –
> A. Uh-huh.
> Q. – was they were intoxicated?
> A. For public intoxication, yes.

*Id.* at 22-23.

The Court concludes that the facts in the record do not support the detention of the Defendant for public intoxication after Officer Peters returned from calling the dispatcher. Officer Peters testified that he did not smell alcohol on Defendant's breath or the other individual's breath; and that there was no stumbling, no slurred speech, and no blood shot eyes. The record lacks facts to support a particularized and objective basis for suspecting the Defendant of public intoxication. The Court does not address

or decide whether the Defendant's Fourth Amendment rights would have been violated if he had been detained for ten minutes in order to investigate an immigration violation. Officer Peters testified that the detention after his return after calling the dispatcher was to investigate public intoxication and did not assert a suspicion of immigration violation as a basis for the detention. Officer Peters testified "it was an investigative detention for public intoxication." *Id*. at 22).

Defendant is entitled to suppression of his statements, including the video as well as evidence collected during his initial processing, as fruits of his illegal detention. However, the Defendant is not entitled to suppression of the officer's identification of him at trial, any evidence from the A-file, or any other independent evidence. In *United States v. Guzman-Bruno*, 27 F.3d 420, 421 (9th Cir. 1994), the Court of Appeals for the Ninth Circuit explained:

> A defendant's identity need not be suppressed merely because it is discovered as the result of an illegal arrest or search. "[T]here is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity." *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir.) (*Hoonsilapa*), *modified by*, 586 F.2d 755 (9th Cir.1978). "The 'body' or identity of a defendant ... is never itself suppressible as a fruit of an unlawful arrest." *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1039, 104 S.Ct. 3479, 3483, 82 L.Ed.2d 778 (1984); *see also United States v. Foppe*, 993 F.2d 1444, 1449 (9th Cir.) (suppression of incidental observations by police, such as appearance, would not have deterrent effect on unlawful police activity), *cert. denied*, 510 U.S. 1017, 114 S.Ct. 615, 126 L.Ed.2d 579 (1993). These cases clearly foreclose Guzman–Bruno's attempt to suppress the fact of his identity.
>
> We have applied the above rule specifically in the context of a prosecution under 8 U.S.C. § 1326, the statute which Guzman–Bruno was charged with violating. In *United States v. Orozco–Rico*, 589 F.2d 433 (9th Cir.1978), cert. denied, 440 U.S. 967, 99 S.Ct. 1518, 59 L.Ed.2d 783 (1979), the defendant complained that his due process rights were violated when the government deported witnesses before he could obtain their testimony to contest the legality of his arrest. We held that it did not matter whether or not his arrest was illegal, since the government would still be able to prove that he was present in the United States merely by virtue of the officer's identification of him. An illegal arrest would not serve to suppress his identity since, " 'there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence.' " *Id.* at 435, *quoting Hoonsilapa*, 575 F.2d at 738. Thus, the district court did not err when it held that neither Guzman–Bruno's identity nor the records of his previous convictions and deportations could be suppressed as a result of the illegal arrest.

1  27 F.3d at 421-422.  *See also United States v. Del Toro Gudino*, 376 F.3d 997, 1001
2  (9th Cir. 2004) ("We continue to hold today that the simple fact of who a defendant is
3  cannot be excluded, regardless of the nature of the violation leading to his identity.");
4  *United States v. Ortiz-Hernandez*, 427 F.3d 567, 577 (9th Cir. 2005) ("Over twenty
5  years ago, the Supreme Court established the general rule that a criminal defendant
6  cannot suppress his identity, even when there has been some prior illegality on the part
7  of the government."); and *United States v. Garcia-Beltran*, 443 F.3d 1126, 1132 (9th
8  Cir. 2005) ("The Ninth Circuit has consistently held that evidence concerning the
9  identity of a defendant, obtained after an illegal police action, is not suppressible as
10 'fruit of the poisonous tree.'").

11 **Defendant's motion to dismiss the information** (ECF No. 17)

12    Defendant contends that the expedited removal on June 9, 2011 violated his due
13 process rights and caused him substantial prejudice.  Defendant contends that
14 Department of Homeland Security officials failed to advise him of his right to counsel,
15 failed to adequately inform him of the charges against him, and failed to advise him of
16 his right to seek withdrawal of his application for admission.

17    The Government contends that the Defendant was informed of the allegations
18 against him and his right to seek counsel.  The Government contends that the Defendant
19 had no right to withdraw his application for admission and that the Defendant cannot
20 demonstrate a plausible claim of prejudice based upon withdrawal of his application.
21

22    Defendant was apprehended by the Department of Homeland Security officials
23 after entering the United States illegally on November 1, 2009; January 12, 2010;
24 January 15, 2010; and June 1, 2011.  (ECF No. 24-1 at 8-18).  On June 7, 2011,
25 Defendant was apprehended by Border Patrol and placed into expedited removal
26 proceedings.  Defendant was a served Notice of Rights Form I-826 in the Spanish
27 language which stated in part: "You have been arrested because immigration officers
28 believe that you are illegally in the United States.  You have the right to a hearing

before the Immigration Court to determine whether you may remain in the United States. ... You have the right to contact an attorney or other legal representative to represent you at your hearings, or to answer any questions regarding your legal rights in the United States. Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee." (ECF No. 26). The form was signed and dated June 7, 2011 by the Defendant.

On June 8, 2011, Defendant was served with a Determination of Inadmissibility Form I-860 which stated in part:

> Pursuant to section 235(b)(1) of the Immigration and Nationality Act..., the Department of Homeland Security has determined that you are inadmissible to the United States ... and subject to removal, in that: You are an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card or other valid entry document required by the Immigration and Nationality Act. You are not a citizen or national of the United States, you are a native of Mexico and citizen of Mexico, and on June 7, 2011, you illegally entered the United States at/near Jacumba, California, and you were not inspected by an Immigration Officer.

(ECF No. 17-2 at 3). An immigration officer certified that the original of this form was personally served upon the Defendant. Defendant was interviewed by a Officer of the Department of Homeland Security and informed of his consular rights.[2] Defendant stated that he was willing to answer questions and swore to tell the truth. Defendant told the officer that he was born on October 2, 1970 in Humuleo, Mexico; that he was a citizen of Mexico; and that he was not in possession of any immigration documents that allow him to legally enter or remain in the United States. Defendant told the officer that his parents are citizens of Mexico and reside in Mexico, and that his two daughters and "most of his family lives" in the United States. *Id*. at 8. Defendant told the officer that he was returning to Los Angeles to return to his job and to be with his family. Defendant was asked how many times he had been apprehended by the United States Border Patrol for entering the United States illegally and responded "three to four

---

[2] A record of the facts of the case was created by sworn statement using Form I-867B signed and initialed by the Defendant. (ECF No. 17-2 at 8-11).

times." *Id*. at 9. Defendant stated that he had no fear or concern of harm if returned to his home country.

On June 8, 2011, Defendant was found to be inadmissible and ordered removed from the United States. *Id*. at 3. On June 9, 2011, Defendant was removed to Mexico. *Id.* at 5.

"Expedited removal proceedings provide a streamlined process by which U.S. officers can remove aliens who attempt to gain entry to the United States but are not admissible." *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1080 FN 2 (9th Cir. 2011). In *Barajas-Alvarado*, the Court of Appeals explained:

> The expedited removal statute, § 1225(b), provides that when an alien seeks admission to the United States after arriving at a port of entry and does not have entry documents, misrepresents the alien's identity or citizenship, or presents fraudulent identity or immigration documents, "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution." § 1225(b)(1)(A)(i). The agency has promulgated regulations governing the procedures for expedited removal. *See* 8 C.F.R. § 1235.3(b)(2)(i). First, "the examining immigration officer shall create a record of the facts of the case and statements made by the alien ... by means of a sworn statement using Form I–867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1)." *Id.* The alien must sign and initial each page. *Id.* Second, the immigration officer "shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement." *Id.* The immigration officer then serves the alien with Form I–860, and the alien must sign the back of the form to acknowledge receipt. *Id*. "Interpretative assistance shall be used if necessary to communicate with the alien." *Id.*

655 F.3d at 1081 (footnote omitted). Since administrative and judicial review of expedited removal proceedings are limited by statute, Defendant is entitled to "some meaningful review" of an expedited removal used in a prosecution under 8 U.S.C. § 1326. *Id*. at 1087-88. Therefore, this Court examines the Defendant's claim that his June 2011 expedited removal was "fundamentally unfair, meaning that the procedural errors he identified deprived him of due process, and he suffered prejudice as a result." *Id*. at 1088.

Initially, Defendant asserts that he was not informed of the charges against him. The record establishes that the Defendant was served with the Determination of

Inadmissibility Form I-860 which informed him of the charge that he is inadmissible to the United States on the grounds that he is a not a citizen or the United States, that he is a citizen of Mexico, that he illegally entered the United States without inspection, and that he was not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card or other valid entry document.  At the June 8, 2011 hearing, Defendant was initially informed of the charge that he appears to be inadmissible by the immigration officer.[3]  Defendant stated that he understood and that he was willing to answer questions.  After swearing to tell the truth, Defendant stated that he was born on October 2, 1970 in Humuleo, Mexico; that he was a citizen of Mexico and that he was not in possession of any immigration documents that allow him to enter or to remain in the United States legally.  Defendant told the officer that his parents are citizens of Mexico and reside in Mexico, and that his two daughters and "most of his family lives" in the United States.  Defendant told the officer that he was returning to Los Angeles to return to his job and to be with his family. (ECF No. 17-2 at 7-8).  Defendant stated that he had entered the United States illegally through the mountains on Monday and that he had been apprehended three or four times prior to this time for entering the United States illegally.  The record establishes that the Defendant was informed of the charges against him, that he stated that he was willing to answer questions by the immigration officer, and that the Defendant admitted the charges.

Defendant further asserts that immigration officials failed to advise him of his right to counsel, and failed to advise him of his right to seek withdrawal of his application for admission.  No statute or regulation provides that non-admitted aliens have the right to representation in expedited removal proceedings.  *See Barajas-Alvarado*, 655 F.3d at 1088.  The record in this case contains a document prepared by immigration officials and signed by the Defendant entitled "Notice of Rights and Request for Disposition" (I-826).  This document indicates that the Defendant was

---

[3] The record indicated that the hearing was translated in the Spanish language. (ECF No. 17-2 at 7).

informed of his right to contact an attorney on June 7, 2011. (ECF No. 26).[4] The record in this case shows that Defendant was informed of his right to representation at the hearing.

Even if Defendant suffered a due process violation at his expedited removal proceeding, Defendant would be required to show prejudice in order to collaterally attack the removal. The only form of relief relevant to the June 2011 removal proceeding was withdrawal of the application for admission. In *Barajas-Alvarado*, the Court of Appeals explained:

> Although an arriving alien may ask to withdraw an application for admission, the grant of such relief is discretionary. *See* 8 C.F.R. § 1235.4. Prior to IIRIRA, both IJs and immigration officers had the authority to permit an alien to withdraw an application for admission under certain circumstances, an exercise of discretion recognized in the case law, *see In re Gutierrez*, 19 I. & N. Dec. 562 (B.I.A.1988), but not codified. In *Gutierrez*, the BIA instructed IJs on how this discretion should be exercised, and indicated (among other things) that an alien's attempted fraudulent entry would ordinarily make the alien ineligible for withdrawal relief. *See id.* at 565 ("[E]ven if we were to disregard the applicant's attempted fraudulent entry, we can discern no facts or circumstances relevant to the issue of his admissibility which suggest that justice demands that he be allowed to withdraw his application for admission."). When Congress enacted IIRIRA, it codified this form of discretionary relief in § 1225(a)(4). The agency subsequently developed regulations authorizing immigration officers to permit arriving aliens to withdraw their applications for admission "in lieu of removal proceedings" or expedited removal. *See* 8 C.F.R. § 1235.4.
>
> While the statute and regulation set forth scant guidance for the immigration officer to determine whether to grant withdrawal relief, the agency has prepared an internal document, an Inspector's Field Manual, to guide the immigration inspector's exercise of discretion. The Field Manual sets forth six factors that the immigration officer should consider in evaluating an alien's request for permission to withdraw, namely: (1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations. Like *Gutierrez*, it concludes that "[a]n expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant." INS Inspector's Field Manual § 17.2(a) (2001), *available at* Westlaw FIM–INSFMAN 17.2.
>
> Although the Field Manual does not have the force of law, *see Christensen*

---

[4]The document appears in the record in the Spanish language (ECF No. 26) along with the uncontested English translation. (ECF No. 24-1 at 6).

> *v. Harris Cnty.*, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), and thus is not entitled to *Chevron*-style deference, it guides the immigration officers' discretion and therefore gives us insight regarding whether it is plausible that an immigration officer would have granted Barajas–Alvarado's request for withdrawal.

655 F.3d at 1089-1090 (footnote omitted).

In this case, Defendant entered illegally through the mountains and had no right to withdraw his application for admission. Any grant of such relief would be discretionary. "Where the relevant form of relief is discretionary, the alien must make a plausible showing that the facts presented would cause the Attorney General to exercise discretion in his favor." *Id.* at 1089 (quotations and citations omitted). In this case, the factors noted above weigh against a finding that it was plausible that the Defendant would have been allowed to withdraw his application for admission had he been informed of and requested such relief. Prior to the June 9, 2011 removal, Defendant had entered illegally on November 1, 2009; January 12, 2010; January 15, 2010, and June 1, 2011. The expedited removal proceedings on June 8, 2011 was one week after his last entry and shortly after his illegal reentry through the mountains. Defendant had a significant criminal history, including a conviction for misdemeanor inflicting corporal injury on a spouse or cohabitant, misdemeanor driving while under the influence, and driving with a suspended or revoked license. Defendant was 41 years old with no indication of poor health. Defendant's immigration history and criminal history support the conclusion that it was not plausible that the Defendant would have been allowed to withdraw his application had he requested such relief. *See Barajas-Alvarado*, 655 F.3d at 1091 ("seriousness of the crimes for which [the Defendant] was removed, and his ties to the United States [] are not listed as considerations in the Inspector's Field Manual and therefore carry little weight...").

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that 1) the motion to dismiss the information (ECF No. 17) is denied and 2) the motion to suppress evidence is granted in part and to dismiss the information is denied (ECF No. 22).

DATED: June 20, 2013

*William Q. Hayes*
**WILLIAM Q. HAYES**
United States District Judge